**No. 13-2176**

# In the United States Court of Appeals for the Fourth Circuit

---

ELDERBERRY OF WEBER CITY, LLC,
a Virginia limited liability company,

*Plaintiff-Appellee,*

*v.*

LIVING CENTERS - SOUTHEAST, INCORPORATED,
a North Carolina corporation; FMSC WEBER CITY OPERATING
COMPANY, LLC, a Delaware limited liability company;
CONTINIUMCARE OF WEBER CITY, LLC, a Florida limited liability
company; and MARINER HEALTH CARE, INCORPORATED,
a Delaware corporation,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

---

## BRIEF OF APPELLANTS

---

James F. Segroves
HOOPER, LUNDY & BOOKMAN, PC
975 F Street, NW, Suite 1050
Washington, DC 20004
(202) 580-7710
jsegroves@health-law.com

Lori D. Thompson
LECLAIRRYAN, PC
1800 Wells Fargo Tower
Drawer 1200
Roanoke, VA 24006
(540) 510-3011
lori.thompson@leclairryan.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  13-2176          Caption:  Elderberry of Weber City, LLC v. Living Centers - Southeast, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Living Centers - Southeast, Inc.
(name of party/amicus)

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                           ☑ YES ☐ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
        Living Centers - Southeast, Inc. is a subsidiary of MHC MidAtlantic Holding Company, which is a subsidiary of MHC Holding Company, which is a subsidiary of Mariner Health Care, Inc., which is a subsidiary of National Senior Care, Inc.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                ☐ YES ☑ NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __s/James F. Segroves_____     Date: ___February 27, 2014___

Counsel for: __Living Centers - Southeast, Inc.____

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on __February 27, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

__s/James F. Segroves_____          ___February 27, 2014___
(signature)                                              (date)

- ii -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  13-2176          Caption:  Elderberry of Weber City, LLC v. Living Centers - Southeast, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

FMSC Weber City Op. Co., LLC
(name of party/amicus)


who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.     Does party/amicus have any parent corporations?                      ☐ YES ☑ NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                ☐ YES ☑ NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __s/James F. Segroves_____    Date: ___February 27, 2014___

Counsel for: __FMSC Weber City Op. Co., LLC___

## CERTIFICATE OF SERVICE
**************************

I certify that on __February 27, 2014___ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

__s/James F. Segroves_____         ___February 27, 2014___
(signature)                                    (date)

- iv -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2176__     Caption: __Elderberry of Weber City, LLC v. Living Centers - Southeast, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__ContiniumCare of Weber City, LLC__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __s/James F. Segroves_____     Date: ___February 27, 2014___

Counsel for: __ContiniumCare of Weber City, LLC___

## CERTIFICATE OF SERVICE
****************************

I certify that on __February 27, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

__s/James F. Segroves_____          __February 27, 2014____
         (signature)                                  (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2176__        Caption: __Elderberry of Weber City, LLC v. Living Centers - Southeast, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Mariner Health Care, Inc.__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                ☑YES ☐NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
         Mariner Health Care, Inc. is a subsidiary of National Senior Care, Inc.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/James F. Segroves          Date:    February 27, 2014

Counsel for: Mariner Health Care, Inc.

## CERTIFICATE OF SERVICE
**************************

I certify that on   February 27, 2014   the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/James F. Segroves                                      February 27, 2014
(signature)                                                    (date)

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE FORMS………..…………………………..i

TABLE OF AUTHORITIES .................................................................xi

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF ISSUES...................................................................3

STATEMENT OF THE CASE ..............................................................3

     A.    Factual Background................................................................3

         1.    The Living Centers Lease ...........................................4

         2.    The Lease Amendment and Form-Of Guarantee Document ......................................................5

         3.    Assignment and Termination of the Living Centers Lease ............................................................7

         4.    The Smith/Packett Agreement and Nova Lease ........8

     B.    Procedural History...............................................................10

         1.    Commencement and Consolidation of Actions..........10

         2.    The District Court's Guarantee Ruling.....................10

         3.    The District Court's Post-Trial Findings of Fact and Conclusions of Law ....................................12

SUMMARY OF ARGUMENT ..............................................................15

ARGUMENT ....................................................................................17

    I.    THE DISTRICT COURT'S DAMAGES AWARD SHOULD BE REVERSED IN SIGNIFICANT PART .....................................................17

      A.      Standard of Review................................................17

      B.      Elderberry's Termination of the Lease Precludes
              Any Claim for Damages Not Yet Accrued as of the
              Termination Date ................................................18

      C.      The District Court Erred by Awarding Elderberry
              Speculative Damages............................................24

      D.      The District Court Failed to Reduce the Award of
              Future Damages To Its Present Value ..............................24

II.    THE DISTRICT COURT ERRED IN FINDING THAT THE FORM-OF
       GUARANTEE DOCUMENT IS ENFORCEABLE AGAINST
       MARINER ...................................................................25

      A.      Standard of Review................................................25

      B.      The Form-Of Guarantee Document Does Not
              Satisfy Georgia's Statute of Frauds ....................................26

CONCLUSION .................................................................34

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM:

Ga. Code Ann. § 13-5-30.................................................. Add. 1

Ga. Code Ann. § 24-3-3.................................................. Add. 2

*Margie Int'l Trading Co. v. Stein*,
   948 F.2d 1281 (4th Cir. 1991) (unpublished table decision) ...... Add. 3

# TABLE OF AUTHORITIES

Page(s)

## CASES

*C.L.D.F. Inc. v. Aramore, LLC*,
   659 S.E.2d 695 (Ga. Ct. App. 2008)..................................11, 30, 31, 32

*Carolina Power & Light Co. v. Dynegy Mktg. & Trade*,
   415 F.3d 354 (4th Cir. 2005)....................................................................2

*Chesapeake & Ohio Ry. v. Kelly*,
   241 U.S. 485 (1916)................................................................................24

*Crowder v. Va. Bank of Commerce*,
   103 S.E. 578 (Va. 1920)..........................................................................20

*Elderberry of Weber City, LLC v. Living Ctrs. - S.E., Inc.*,
   --- F. Supp. 2d ---, No. 6:12-cv-00052,
   2013 WL 4779013 (W.D. Va. Sept. 6, 2013)............................... *passim*

*Elderberry of Weber City, LLC v. Living Ctrs. - S.E., Inc.*,
   958 F. Supp. 2d 623 (W.D. Va. 2013) .................................10, 12, 29, 32

*Frey v. Abdo*,
   441 So. 2d 1383 (Miss. 1983) ................................................................23

*Knight v. OMI Corp.*,
   568 P.2d 552 (Mont. 1977).....................................................................23

*Legacy Cmtys. Group, Inc. v. Branch Banking & Trust Co.*,
   729 S.E.2d 612 (Ga. Ct. App. 2012)................................................26, 33

*Margie Int'l Trading Co. v. Stein*,
   948 F.2d 1281 (4th Cir. 1991)
   (unpublished table decision)..................................................................19

*Marina Shores, Ltd. v. Cohn-Phillips, Ltd.*,
   435 S.E.2d 136 (Va. 1993).....................................................................18

*Mavity v. MTD Prods., Inc.*,
   714 F. Supp. 2d 577 (W.D. Va. 2010) ...................................................25

*McArthur v. Rostek*,
   483 P.2d 1351 (Colo. App. 1971)
   (not selected for official publication) ...................................................24

*McDonald v. Ferguson Enters.*,
   618 S.E.2d 45 (Ga. Ct. App. 2005)......................................................29

*PCS Nitrogen Inc. v. Ashley II of Charleston LLC*,
   714 F.3d 161 (4th Cir. 2013).................................................................25

*Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of*
   *Operating Eng'rs & Participating Employers*,
   134 S. Ct. 773 (2014).............................................................................2

*Roanoke Cement Co. v. Falk Corp.*,
   413 F.3d 431 (4th Cir. 2005).................................................................17

*Roden Elec. Supply, Inc. v. Faulkner*,
   524 S.E.2d 247 (Ga. Ct. App. 1999).....................................................29

*Rohrt v. Kelly Mfg. Co.*,
   349 S.W.2d 95 (Tex. 1961) ........................................................20, 21, 23

*Sacher v. Taco Grande of Iowa, Inc.*,
   313 N.W.2d 257 (Neb. 1981).........................................................22, 23

*Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*,
   377 F.3d 408 (4th Cir. 2004).................................................................17

*SunTrust Bank v. Farrar*,
   675 S.E.2d 187 (Va. 2009).....................................................................24

*Sysco Food Servs., Inc. v. Coleman*,
   489 S.E.2d 568 (Ga. Ct. App. 1997)...........................................*passim*

*tenBraak v. Waffle Shops, Inc.*,
   542 F.2d 919 (4th Cir. 1976).........................................................18, 25

*United States v. King,*
    673 F.3d 274 (4th Cir. 2012)....................................................26

*Universal Furniture Int'l v. Collezione Europa USA,*
    618 F.3d 417 (4th Cir. 2010)..................................................17

## STATUTES

28 U.S.C. § 1291........................................................................2

28 U.S.C. § 1332(a) ...............................................................1, 2

Ga. Code Ann. § 13-5-30(2) ...................................................11

## OTHER AUTHORITIES

Restatement (Second) of Prop.:
    Landlord & Tenant § 12.1 cmt. g (1977) ...............................18

# In the United States Court of Appeals for the Fourth Circuit

————————————

No. 13-2176

————————————

ELDERBERRY OF WEBER CITY, LLC,
a Virginia limited liability company,

*Plaintiff-Appellee,*

*v.*

LIVING CENTERS - SOUTHEAST, INCORPORATED,
a North Carolina corporation; FMSC WEBER CITY OPERATING
COMPANY, LLC, a Delaware limited liability company;
CONTINIUMCARE OF WEBER CITY, LLC, a Florida limited liability
company; and MARINER HEALTH CARE, INCORPORATED,
a Delaware corporation,

*Defendants-Appellants.*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

————————————

## BRIEF OF APPELLANTS

————————————

## JURISDICTIONAL STATEMENT

This appeal arises from two consolidated actions originating in two different district courts. In the first action, Defendant-Appellant Mariner Health Care, Inc. (Mariner) invoked the subject-matter jurisdiction of the United States District Court for the Northern District of Georgia under 28 U.S.C. § 1332(a). 2 Joint Appendix (JA) 815. In the second action, Plaintiff-Appellee Elderberry of Weber City, LLC (Elder-

- 1 -

berry) invoked the subject-matter jurisdiction of the United States District Court for the Western District of Virginia under 28 U.S.C. § 1332(a). 1 JA 24. The Georgia action was transferred to the Western District of Virginia, which consolidated the two cases and designated Elderberry's action as the lead proceeding. 2 JA 838.

The Western District of Virginia entered its final judgment on September 6, 2013. 2 JA 805. Defendants-Appellants Living Centers - Southeast, Inc. (Living Centers); FMSC Weber City Operating Company, LLC (FMSC); ContiniumCare of Weber City, LLC (Continium); and Mariner (collectively, Defendants) timely filed an amended notice of appeal on September 20, 2013. 2 JA 807. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. Although Elderberry's motion for attorney's fees under the lease in question remains pending in the district court, that fact does not affect the finality of the district court's judgment. *See Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Employers*, 134 S. Ct. 773, 777 (2014), *abrogating Carolina Power & Light Co. v. Dynegy Mktg. & Trade*, 415 F.3d 354 (4th Cir. 2005).

## STATEMENT OF ISSUES

1.    Whether the district court erred in holding that Elderberry could recover future rents and other damages that accrued after Elderberry terminated the lease.

2.    Whether, even if Elderberry's termination of the lease had no remedial consequences, the district court erred in awarding Elderberry almost $3,000,000 in damages, which included amounts for such things as contingency-based payments Elderberry might not have to make in the future, and which amounts the district court failed to reduce to their present value.

3.    Whether the district court erred in finding that a form-of guarantee document satisfies Georgia's statute of frauds even though the document contains blanks omitting the identity of the principal debtor, the debt owed, and the promisee.

## STATEMENT OF THE CASE

### A.    Factual Background

This is a lease dispute involving a Virginia nursing facility owned by Elderberry. The facts relevant to this appeal are largely undisputed and are derived from various documents and the district court's factual findings.

### 1.    The Living Centers Lease

In 2000, Elderberry's corporate predecessor—Elderberry Nursing Home, Inc. (Elderberry Inc.)—leased the nursing facility to Living Centers for a 10-year term. Lease Agreement (Lease) ¶¶ 1-2 (Nov. 8, 2000), 1 JA 164. At the time, Living Centers was already operating the nursing facility as a debtor in bankruptcy. *Id.* ¶ 6(14), 1 JA 171. With certain exceptions, the Lease did not allow Living Centers to assign the Lease without the written permission of Elderberry Inc. *Id.* ¶ 4(4), 1 JA 167. The Lease stated that its terms were governed by Virginia law. *Id.* ¶ 6(8), 1 JA 170.

Of central importance to this appeal, paragraph 7(3) of the Lease provided the following relevant language with respect to rights in default:

> (a)    Upon any Default by the Lessee [defined as Living Centers] and at any time thereafter, the Lessor [defined as Elderberry Inc.] may give written notice to the Lessee that the Lessor elects to terminate this Lease upon a specific date not later than thirty (30) days after mailing of such notice. This Lease shall then be terminated on the date so specified.

> (b)    Upon an uncured Default by the Lessee, and notice from the Lessor, the Lessor may reenter and resume possession of the Property. The Lessor, at the Lessor's option, may remove persons and property from the Property

and may store the property in a public warehouse or else-
where at the expense or for the account of the Lessee with-
out liability for any damage on account of such removal. *The
Lessor's reentry shall not be deemed either an acceptance or a
surrender of this Lease or a termination thereof. It is express-
ly understood and agreed that in the event of the reentry by
the Lessor by reason of a default of the Lessee, the Lessee
shall nevertheless remain liable for the Rent and also for the
taxes and insurance premiums payable by the Lessee as pro-
vided in this Lease, for the balance of the term herein origi-
nally demised. . . .*

Lease ¶ 7(3), 1 JA 172 (emphasis added). For ease of reference, para-

graph 7(3)(a) of the Lease will be referred to as the "Termination Provi-

sion," whereas paragraph 7(3)(b) of the Lease will be referred to as the

"Reentry Provision."

### 2.   The Lease Amendment and Form-Of Guarantee Document

The Lease was amended in 2006 after Elderberry acquired the

nursing facility from Elderberry Inc. *See* 1st Am. to Lease Agreement

(Lease Am.) (June 19, 2006), 1 JA 176. Among other things, the Lease

Amendment extended the term of the Lease for an additional 10 years

and provided that Living Centers could assign the Lease without the

prior written authorization of Elderberry. Lease Am. ¶¶ 5, 9, 1 JA 178,

180. The assignment language added to the Lease read, in relevant

part:

- 5 -

> Notwithstanding anything to the contrary contained in this Lease, *Landlord* and *Tenant* hereby expressly agree that Tenant shall not be required to obtain Landlord's consent or approval for a one-time only assignment, sublease, or combination assignment and sublease of the Lease to Family Senior Care Holdings LLC or any of its subsidiaries or affiliates, provided that Tenant shall obtain for Landlord a Lease Guarantee from Mariner Health Care, Inc., in the form and content of the Lease Guarantee attached hereto as Exhibit "E."

Lease Am. ¶ 9, 1 JA 180 (emphasis added). The terms "Landlord" and "Tenant" are not separately defined by the Lease Amendment or the Lease, both of which use the defined terms "Lessor" and "Lessee." The Lease Amendment did not alter the Lease's remedial provisions.

Attached as Exhibit E to the Lease Amendment was a form-of guarantee document. 1 JA 196. The form-of document contained several blanks, brackets, and undefined terms, stating in relevant part:

> FOR VALUE RECEIVED, and in connection with the assignment and transfer of the rights of tenant under a certain Lease Agreement, dated [_____], between [LANDLORD] ("Landlord") and [TENANT] ("Original Tenant"), as the same was assigned by Original Tenant to [NEW TENANT] ("Tenant"), pursuant to an Assignment and Assumption Agreement, dated [_____] (as further amended, modified or assigned, the "Lease"), covering certain premises known as [FACILITY NAME AND ADDRESS], Mariner Health Care, Inc., a Delaware corporation, the undersigned (hereinafter referred to as "Guarantor," whether one or more) hereby guarantees unto Landlord the full and prompt

> payment of the rent and all other sums and charges payable
> by Tenant under the Lease . . . .

1 JA 196 (brackets, blanks, underlining, and use of all capitals in original). The form-of guarantee document was signed by a Mariner officer. 1 JA 198.

### 3. Assignment and Termination of the Living Centers Lease

Evidence was presented at trial supporting the conclusion that Living Centers assigned the Lease to FMSC, which later assigned the Lease to Continium. *See* Trial Op. at 5-9, 2 JA 773-77.[1] Continium stopped paying rent to Elderberry after March 2012. *Id.* at 3, 2 JA 771.

After negotiations to reduce the amount of rent proved unsuccessful, Elderberry notified Defendants by letter dated August 15, 2012, that if Elderberry did not receive payment of past-due amounts within seven days of the notice, Elderberry would be "entitled to proceed with

---

[1] The question whether there was a valid, written assignment of the Lease between Living Centers and FMSC was contested at trial. However, for purposes of appeal, Defendants do not challenge the district court's finding that a valid assignment took place. *See* Trial Op. at 20, 2 JA 788. The district court's trial opinion is designated for publication but is still only available electronically. *See Elderberry of Weber City, LLC v. Living Ctrs. - S.E., Inc.*, No. 6:12-cv-00052, 2013 WL 4779013 (W.D. Va. Sept. 6, 2013).

pursuit of its remedies under the Lease, including, but not limited to, seeking damages in court, termination of the Lease, and/or taking possession of the Property from you." 1 JA 202. The August 15 letter also stated that Elderberry had been informed of Continium's transferring of facility residents and intent to abandon the facility later that month. *Id.*

By letter dated August 24, 2012, Elderberry once again contacted Defendants. 2 JA 607. Entitled "**LEASE TERMINATION NOTICE**," the August 24 letter stated, in relevant part:

> Tenant is in default of the Lease. Accordingly, this letter shall serve as notice that the Lease is hereby terminated, effective at 12:00 midnight EST on August 24, 2012. Landlord reserves all rights and remedies related to Tenant's default whether under the Lease, at law or in equity.

*Id.*

### 4.    The Smith/Packett Agreement and Nova Lease

Elderberry entered into an agreement with Smith/Packett Med-Com, LLC (Smith/Packett) to assist Elderberry with finding a new tenant, negotiating a new lease, and managing the facility under the new lease. Trial Op. at 12, 2 JA 780. The agreement provided that Smith/Packett would be compensated in three ways. First, Elderberry would pay Smith/Packett a $150,000 "signing fee" if a new lease meet-

ing certain requirements was executed. *Id.* at 12-13, 2 JA 780-81. Second, Elderberry would pay Smith/Packett a $375,000 "value fee" on June 1, 2015, if the new tenant was not in default at that time and certain other conditions were satisfied. *Id.* Third, Elderberry would pay Smith/Packett a monthly fee equal to 10 percent of the rent payable under the new lease in return for Smith/Packett providing management services related to the facility. *Id.*

Elderberry eventually entered into a new lease with Nova Healthcare Group, LLC (Nova). Trial Op. at 12, 2 JA 780. As amended, the Nova lease was for a 10-year term beginning January 1, 2013; however, Elderberry and Nova agreed that Nova would not begin paying rent until March 2013. *Id.* at 15, 2 JA 783. The rent provided by the Nova lease was less than that provided by the Living Centers Lease. *Id.* at 16, 2 JA 784. The Nova lease also required Elderberry to provide a renovation budget and working capital totaling $1,250,000. *Id.* at 15, 2 JA 783.

**B.    Procedural History**

**1.    Commencement and Consolidation of Actions**

One week after Elderberry's August 24, 2012 letter terminating the Living Centers Lease, Mariner commenced a diversity action against Elderberry in the Northern District of Georgia seeking a declaratory judgment that the form-of guarantee document was unenforceable. 2 JA 815. Approximately one month later, Elderberry commenced a diversity action against Defendants in the Western District of Virginia seeking damages. 1 JA 22. The Georgia action was later transferred to the Western District of Virginia, which consolidated the two cases and designated Elderberry's action as the lead proceeding. 2 JA 838.

**2.    The District Court's Guarantee Ruling**

On cross-motions for summary judgment, the district court (Norman K. Moon, J.) held that the form-of guarantee document was valid and enforceable against Mariner. MSJ Op. at 10, 1 JA 80.[2] Applying Georgia law, the district court acknowledged that Georgia's statute of

---

[2] The district court's guarantee ruling is published at 958 F. Supp. 2d 623.

frauds provides that a "'promise to answer for the debt, default, or mis-carriage of another' must be in writing." *Id.* at 6, 1 JA 76 (quoting Ga. Code Ann. § 13-5-30(2)). The district court also acknowledged Georgia precedent providing that, even when the intent of the parties is mani-festly clear, a guarantee document that omits the name of the principal debtor or other critical information fails to satisfy the statute of frauds. *Id.* at 6-7, 1 JA 76-77.

However, the district court then stated that "Georgia law also ap-pears to include a broader exception for contemporaneous writings generally, even if such writings do not explicitly incorporate each oth-er." MSJ Op. at 8, 1 JA 78. Relying primarily on a decision that none of the parties had cited—*C.L.D.F. Inc. v. Aramore, LLC*, 659 S.E.2d 695 (Ga. Ct. App. 2008)—the district court found that the Lease Amend-ment and form-of guarantee document could be considered together in determining whether the guarantee document satisfied the statute of frauds. *Id.* at 8-9, 1 JA 78-79. Applying the contemporaneous-writings rule, the district court asserted that

> the question remains whether it is possible to fill in the es-
> sential terms of the Guaranty simply by reading these two
> documents together. As Mariner points out, the Lease
> Amendment and the Guaranty use different defined terms.

> The Lease Amendment uses the terms "Lessor" and ["]Les-
> see" to refer to Elderberry and Living Centers, respectively.
> By contrast, the Guaranty uses the terms "Landlord," "Orig-
> inal Tenant," and "Tenant," but does not specifically state
> what parties are covered by those terms. Reading the two
> documents together and interpreting words according to
> their ordinary meaning, however, it is clear that the term
> "Lessor," which the Lease Agreement defines to mean Elder-
> berry, refers to the same party that the term "Landlord" re-
> fers to in the Guaranty. Similarly, the term "Lessee," which
> the Guaranty defines to mean Living Centers, refers to the
> same party that the term "Original Tenant" refers to in the
> Guaranty. By reading the two documents together pursuant
> to the contemporaneous writings rule, I conclude that the
> Guaranty does identify the creditor and the principal debtor,
> as required by the Georgia statute of frauds. I also conclude
> that the Guaranty's reference to "a certain Lease Agree-
> ment" sufficiently identifies the obligation Mariner agreed to
> guarantee, especially since that certain Lease Agreement
> was physically attached to the Guaranty.

MSJ Op. at 9-10, 1 JA 79-80.

### 3. The District Court's Post-Trial Findings of Fact and Conclusions of Law

Following a bench trial, the district court issued a written opinion

containing findings of fact and conclusions of law. 2 JA 769. Several

components of the district court's opinion are relevant on appeal.

First, the district court rejected Defendants' argument that Elder-

berry's election to terminate the Lease precluded Elderberry from re-

covering damages that accrued after the termination date. Trial Op. at

26-29, 2 JA 794-97. In so ruling, the district court focused exclusively on the remedial language contained in the Reentry Provision, which states that the lessee shall remain liable for rent and other expenses for the remainder of the lease term if Elderberry elects to reenter the property. *Id.* at 27, 2 JA 795. The district court did not address the fact that, although the Reentry Provision expressly provides that Elderberry's exercising the right of reentry does not in and of itself terminate the Lease, the Lease contains no language authorizing Elderberry to seek unaccrued damages following termination of the Lease.

As a result of the district court's ruling, the district court found that Elderberry was entitled not only to unpaid rent due at the time Elderberry terminated the Lease, but also (1) unpaid rent for the months before Nova began paying rent (i.e., September 2012 through February 2013), and (2) the difference between the rent provided by the Living Centers Lease and that provided by the Nova lease for the remainder of the Living Centers Lease's term (i.e., through April 2017). Trial Op. at 29, 2 JA 797. The district court also found that Elderberry was entitled to taxes, utilities, and insurance premiums for the time period before Nova began making these payments; certain maintenance

- 13 -

fees Elderberry paid after it terminated the Lease; and certain construction costs Elderberry incurred after the termination. *Id.* at 29-31, 2 JA 797-99.

Second, applying a but-for causation standard, the district court found that Elderberry was entitled to the $150,000 "signing fee" it had paid Smith/Packett after termination of the Lease, as well as the $375,000 "value fee" that was not payable to Smith/Packett until 2015 and only if certain contingencies were satisfied. Trial Op. at 31-32, 2 JA 799-800. Using the same causation standard, the district court also found that Elderberry was entitled to the $1,250,000 it had spent on renovations and working capital as required by the Nova lease. *Id.* at 32-33, 2 JA 800-01.

The district court entered judgment in favor of Elderberry and against Defendants in the amount of $2,742,029.50, plus interest. 2 JA 805. In awarding these amounts, the district court did not address Defendants' argument that any amounts for future damages should be reduced to their present value. This appeal by Defendants followed.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's judgment in significant part. First, the district court erred in finding that Elderberry's termination of the Lease did not preclude Elderberry from seeking damages accruing after the termination. It is well established that, unless a lease contains unambiguous language to the contrary, the lessor's termination of a lease precludes the lessor from seeking damages that have not yet accrued. As demonstrated by abundant appellate authority from other jurisdictions addressing lease language similar to that at issue here, Elderberry's election to terminate the Lease severed any claim for unaccrued damages. Although the Lease's Reentry Provision expressly states that Elderberry's *reentry* onto the property does not in and of itself constitute a termination of the Lease (such that the lessee remains liable for rent and other expenses throughout the remainder of the lease term), the Lease contains no language—let alone unambiguous language—stating that the lessee's liability for rent and other expenses survives Elderberry's *termination* of the Lease. Therefore, as a matter of law, Elderberry is only entitled to recover

$220,576.94, which constitutes all unpaid rent accrued prior to Elderberry's termination of the Lease.

Second, even if Elderberry's termination of the Lease had no remedial consequences, the district court's damages award contains other erroneous elements. The district court awarded Elderberry $375,000 for a "value fee" Elderberry might not have to pay Smith/Packett over a year from now if certain conditions are unsatisfied. Virginia law precludes such contingency-based damages. Furthermore, in awarding amounts for future damages, the district court failed to reduce the award to its present value.

Third, the district court erred in finding that the form-of guarantee document satisfies Georgia's statute of frauds. Well-established precedent provides that when a guarantee document omits entirely the identity of the principal debtor, the debt owed, or the promisee, the contemporaneous-writings rule cannot be used to supply the missing information in order to satisfy the statute of frauds. The district court's contrary ruling conflicts with Georgia precedent and relies instead on an inapposite decision that none of the parties cited in their briefing.

# ARGUMENT

## I. THE DISTRICT COURT'S DAMAGES AWARD SHOULD BE REVERSED IN SIGNIFICANT PART

### A.    Standard of Review

The "interpretation of a written contract is a question of law that turns upon a reading of the document itself, and a district court is in no better position than an appellate court to decide such an issue." *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004). Therefore, this Court reviews *de novo* a district court's interpretation of a written lease. The same is true of a district court's application of state property law, which presents a purely legal question subject to *de novo* review. *See Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005). A district court's calculation of damages following a bench trial "is a finding of fact and therefore is reviewable only for clear error, but to the extent those calculations were influenced by legal error, review is *de novo*." *Universal Furniture Int'l v. Collezione Europa USA*, 618 F.3d 417, 427 (4th Cir. 2010) (citation omitted).

**B.    Elderberry's Termination of the Lease Precludes Any Claim for Damages Not Yet Accrued as of the Termination Date**

Virginia follows the well-established rule that, absent lease language to the contrary, a lessee's obligation to pay rent and other potential damages does not continue after a lease has been terminated by the lessor. *See tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 924 (4th Cir. 1976); *Marina Shores, Ltd. v. Cohn-Phillips, Ltd.*, 435 S.E.2d 136, 138 (Va. 1993); *see also* Restatement (Second) of Prop.: Landlord & Tenant § 12.1 cmt. g (1977) ("The obligation of the tenant to pay rent does not arise for any period after the lease is terminated."). Lease language purporting to alter this well-established rule must be strictly construed. *See tenBraak*, 542 F.2d at 925.

Elderberry terminated the Lease by its letter of August 24, 2012, effective at midnight on that date. 2 JA 607. The question, then, is whether the Lease contains unambiguous language permitting Elderberry to avoid operation of the default rule whereby termination of a lease absolves a lessee of potential liabilities that have not yet accrued. The Lease contains no such language, unambiguous or otherwise.

In relevant part, the Lease's Termination Provision grants Elderberry the right to terminate the Lease immediately upon any default by the lessee. Lease ¶ 7(3)(a), 1 JA 172. The Lease's Reentry Provision, in contrast, grants Elderberry the right to reenter and relet the property upon an uncured default by the lessee. *Id.* ¶ 7(3)(b), 1 JA 172. Importantly, the Reentry Provision expressly states that Elderberry's "reentry" shall not constitute "termination" of the Lease. *Id.* The Reentry Provision then states that in the "event of the reentry," the lessee remains liable for rent and other amounts due under the Lease throughout the remainder of the lease term. *Id.* At no point, however, does the Lease state that the lessee remains liable for such amounts after Elderberry elects to *terminate* the Lease.

Neither this Court nor the appellate courts of Virginia have addressed lease language similar to that at issue here. *See, e.g.*, *Margie Int'l Trading Co. v. Stein*, 948 F.2d 1281, at *3 (4th Cir. 1991) (unpublished table decision) (enforcing lease language expressly providing that neither termination of lease nor repossession of property affected

lessee's liability for rents due throughout remainder of lease term).[3] However, abundant persuasive authority from other jurisdictions supports the conclusion that Elderberry's election to terminate the Lease precludes Elderberry from pursuing damages that accrued after August 24, 2012. *See Crowder v. Va. Bank of Commerce*, 103 S.E. 578, 579 (Va. 1920) (looking to other States' jurisprudence for guidance when deciding lease issue).

For example, the Supreme Court of Texas addressed similar lease language in *Rohrt v. Kelly Manufacturing Co.*, 349 S.W.2d 95 (Tex. 1961). There, the lease expressly provided the lessor with the right to terminate the lease for nonpayment of rent, while also providing that lease termination was "without prejudice to any remedies for arrears of rent or breach of covenant." *Id.* at 96. The lease further provided that the lessor could reenter and relet the property, in which event the first lessee would remain liable for any rent deficiency throughout the remainder of the lease term. *Id.*

---

[3] A copy of *Margie Int'l Trading Co.* is included in the addendum to this brief pursuant to Fed. R. App. P. 32.1(b).

The lessor in *Rohrt* terminated the lease for nonpayment of rent, reentered the property, and relet it for less rent. *Id.* at 96-97. The lessor then filed suit against the first lessee seeking the difference between the rent agreed to by the first lessee and that agreed to by the second lessee. *Id.* at 96.

In reversing a decision finding that the lessor was entitled to the difference in rent, the Supreme Court of Texas held that the lessor's termination of the lease precluded the lessor from seeking unaccrued damages. *Id.* at 97. Applying a clear-statement rule, by which a lease must contain clear language in order to alter the default rule whereby termination of a lease precludes the lessor from seeking unaccrued damages, the state supreme court found that the "without prejudice" language contained in the lease's termination provision was insufficient. *Id.* at 98-99. "The right which [the lessor] seeks is covered by the alternate provision contained in the [lease] immediately following that provision under which [the lessor] proceeded," the state supreme court explained. *Id.* at 98-99. Because the lessor had elected to terminate the lease, it could not take advantage of the lease's reentry provision allowing for the recovery of future rents. *Id.* at 99.

The Supreme Court of Nebraska reached the same conclusion in *Sacher v. Taco Grande of Iowa, Inc.*, 313 N.W.2d 257 (Neb. 1981). Like the Lease at issue here, the lease in *Sacher* stated that the lessors could terminate the lease for failure to pay rent. *Id.* at 258. Unlike the Lease at issue here, however, the *Sacher* lease stated that termination of the lease was "without prejudice . . . to any right of action or remedy of the [lessors] in respect to any breach by the [lessee] of any of the covenants herein contained." *Id.* Importantly, like the Lease at issue here, the lease in *Sacher* also stated that the lessors could reenter and relet the property, in which event the lessee would remain liable for any difference in rent throughout the remainder of the lease term. *Id.*

The lessors in *Sacher* terminated the lease for nonpayment of rent. *Id.* After the lessors reentered and relet the property for less rent, they filed suit against the first lessee seeking not only the rent owed prior to the lease termination, but also the difference between the rent agreed to under the first lease and that agreed to under the second lease. *Id.*

The Supreme Court of Nebraska rejected the lessors' claim for the difference in rent. *Id.* at 258-59. "The general rule," the *Sacher* court

explained, "is that a termination of a lease which the lessor elects to assert does not terminate accrued liabilities, including accrued rent, under an option for termination, but it does terminate liabilities to accrue in the future, such as rent, except where, by express provision in the lease, *termination* is not to affect the accrual of such liabilities." *Id.* at 258 (emphasis added). The state supreme court found that the "without prejudice" language contained in the lease's termination provision "was, at best, ambiguous." *Id.* at 258-59. Because the lessors had elected to terminate the lease, they could not take advantage of the language contained in the lease's reentry provision permitting the lessor to pursue unaccrued damages. *Id.* at 259.

*Rohrt* and *Sacher* are consistent with other state supreme court decisions reaching the same result under circumstances similar to this case. *See Frey v. Abdo*, 441 So. 2d 1383, 1385-86 (Miss. 1983) (applying clear-statement rule in finding lease did not unambiguously provide lessor with right to terminate lease and seek post-termination damages); *Knight v. OMI Corp.*, 568 P.2d 552, 554-55 (Mont. 1977) (same); *see also McArthur v. Rostek*, 483 P.2d 1351, 1352-53 (Colo. App. 1971) (not

selected for official publication) (finding lessor could not invoke remedial language of lease's reletting provision after lessor terminated lease).

Accordingly, this Court should reverse the district court's judgment in so far as it awarded Elderberry $2,521,452.56 in post-termination damages. Properly modified, the judgment should award Elderberry $220,576.94, which is the amount of unpaid rent that accrued prior to the Lease's August 24, 2012 termination.

## C.    The District Court Erred by Awarding Elderberry Speculative Damages

"Damages cannot be recovered if derived from uncertainties, contingencies, or speculation." *SunTrust Bank v. Farrar*, 675 S.E.2d 187, 191 (Va. 2009). The district court awarded Elderberry $375,000 for the "value fee" Elderberry *might* have to pay Smith/Packett on June 1, 2015, but only *if* Nova is not in default under its lease at that time. Trial Op. at 31-32, 2 JA 799-800. Virginia law precludes such an award.

## D.    The District Court Failed to Reduce the Award of Future Damages To Its Present Value

"It is self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future." *Chesapeake & Ohio Ry. v. Kelly*, 241 U.S. 485, 489 (1916). Therefore, "when future

- 24 -

payments . . . are to be anticipated, the verdict should be made up on the basis of their present value only." *Id.* at 491; *see also Mavity v. MTD Prods., Inc.*, 714 F. Supp. 2d 577, 586 (W.D. Va. 2010) (predicting Supreme Court of Virginia would follow foregoing rule for state claims).

Of the total amount awarded by the district court, the $375,000 Smith/Packett "value fee" scheduled to be paid in June 2015 and the rent shortfall for October 2013 (the month after the district court's judgment) through April 2017 (the last month of the Lease's term) constitute future damages. Accordingly, the district court should have reduced those components of its damages award to account for their present value. *See, e.g., tenBraak*, 542 F.2d at 922 (noting district court had reduced award of future rents to account for its present value).

## II. THE DISTRICT COURT ERRED IN FINDING THAT THE FORM-OF GUARANTEE DOCUMENT IS ENFORCEABLE AGAINST MARINER

### A. Standard of Review

This Court reviews *de novo* a district court's application of contract principles. *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 173 (4th Cir. 2013). When addressing a question of state law on which the State's highest court has not ruled, this Court generally

defers to the decisions of the State's intermediate appellate court. *United States v. King*, 673 F.3d 274, 279 (4th Cir. 2012).

## B.    The Form-Of Guarantee Document Does Not Satisfy Georgia's Statute of Frauds

Under Georgia law, a "promise to answer for another's debt is only enforceable against the promisor if it identifies the debt, the principal debtor, the promisor, and the promisee." *Legacy Cmtys. Group, Inc. v. Branch Banking & Trust Co.*, 729 S.E.2d 612, 614 (Ga. Ct. App. 2012). Furthermore, it is "well settled that a guaranty must identify the principal debtor *by name.*" *Id.* If any of the foregoing terms are omitted, the guarantee is unenforceable as a matter of law—even if the "intent of the parties is manifestly obvious." *Id.* (internal quotation marks and citations omitted).

As noted above, the form-of guarantee document contains several blanks, brackets, and undefined terms. It states, in relevant part:

> FOR VALUE RECEIVED, and in connection with the assignment and transfer of the rights of tenant under a certain Lease Agreement, dated [_____], between [LANDLORD] ("Landlord") and [TENANT] ("Original Tenant"), as the same was assigned by Original Tenant to [NEW TENANT] ("Tenant"), pursuant to an Assignment and Assumption Agreement, dated [_____] (as further amended, modified or assigned, the "Lease"), covering certain premises known as [FACILITY NAME AND ADDRESS], Mariner

> Health Care, Inc., a Delaware corporation, the undersigned (hereinafter referred to as "<u>Guarantor</u>," whether one or more) hereby guarantees unto Landlord the full and prompt payment of the rent and all other sums and charges payable by Tenant under the Lease . . . .

1 JA 196 (brackets, blanks, underlining, and use of all capitals in original).

Undoubtedly, standing on its own, the form-of guarantee document does not satisfy Georgia's statute of frauds because the document never identifies the principal debtor, debt, or promisee. For example, the form-of document never identifies the principal debtor whose default allegedly triggers Mariner's guarantee obligation—in the words of the form-of document, the "NEW TENANT" that has supposedly accepted an assignment of an unidentified lease covering an unidentified property for an unidentified period of time.

Well-established precedent further provides that this essential information cannot be supplied by the Lease Amendment pursuant to the contemporaneous-writings rule. For example, in *Sysco Food Services, Inc. v. Coleman*, 489 S.E.2d 568, 569 (Ga. Ct. App. 1997), the Georgia Court of Appeals addressed a guarantee found on the same page as a purchase agreement. The purchase agreement identified a particular

corporate entity as the "purchaser"; however, the guarantee contained within the purchase agreement contained a blank for the principal debtor, which it identified simply as "(_____ 'Company')." *Id.* (blank in original).

The Georgia Court of Appeals found that even if it applied the contemporaneous-writings rule and considered the purchase agreement in conjunction with the guarantee, the guarantee still did not satisfy the statute of frauds because the two agreements did not use identical terms. *See id.* at 570 ("The terms agreement refers to 'seller' (Sysco Corporation and any of its subsidiaries and affiliated entities) and 'purchaser' (The Charlton Club South). In contrast, the individual personal guaranty refers to 'company' (unidentified, unnamed) and 'seller' (Sysco Corporation and each of its subsidiaries and affiliated entities)."). In so ruling, the appellate court explained that

> [i]n an unbroken line of authority, this Court has consistently held that where a guaranty *omits* the name of the principal debtor, it is unenforceable as a matter of law. . . . Even where the intent of the parties is manifestly obvious, where the name of the principal debtor is *omitted* from the document, the agreement is not enforceable because it fails to satisfy the statute of frauds.

*Id.* at 569-70 (emphasis added). "Judicial construction of the contract of guaranty," the appellate court further explained, "is improper because this defect cannot be treated as an ambiguity. While parol evidence may be admitted to explain ambiguities in descriptions, it cannot be admitted to supply a description entirely omitted." *Id.* at 570. "Regardless of why the omission occurred, it rendered the purported guaranty defective and unenforceable as a matter of law." *Id.* at 571.

The Georgia Court of Appeals has consistently applied *Sysco* to invalidate guarantee documents similar to that at issue here. *See, e.g.*, *McDonald v. Ferguson Enters.*, 618 S.E.2d 45, 46-47 (Ga. Ct. App. 2005) (applying *Sysco* in finding guarantee was unenforceable because it failed to identify principal debtor by name, using undefined term "Applicant" instead); *Roden Elec. Supply, Inc. v. Faulkner*, 524 S.E.2d 247, 248 (Ga. Ct. App. 1999) (applying *Sysco* in finding guarantee was unenforceable because it failed to identify principal debtor by name, using instead "the above business" in apparent reference to corporate entity listed on page one of two-page document).

Although the district court acknowledged *Sysco*'s existence, *see* MSJ Op. at 6-7, 1 JA 76-77, it made no effort to address the fact that

*Sysco* rejected application of the contemporaneous-writings rule under circumstances nearly identical to those at issue here. Instead, the district court erroneously relied on a decision that none of the parties ever cited: *C.L.D.F. Inc. v. Aramore, LLC*, 659 S.E.2d 695 (Ga. Ct. App. 2008).

*C.L.D.F.* is clearly distinguishable from this case. There, a lease named a particular corporate entity (C.L.D.F.) as the lessee. *Id.* at 695-96. The original version of the lease, however, listed another corporate entity (Heavenly Ventures) as the lessee. *Id.* On the day of lease signing, the alleged guarantor—an individual named Fuqua who was the sole owner of C.L.D.F. but who only had a minority interest in Heavenly Ventures—insisted that all references in the lease to Heavenly Ventures be changed to C.L.D.F., thereby making C.L.D.F. the lessee. *Id.* at 696. The lease itself also identified Fuqua as the sole guarantor, which was accomplished after Fuqua struck out the names of Heavenly Ventures' other owners who had previously been identified as co-guarantors. *Id.*

Attached to the lease and expressly incorporated as a "fundamental provision" thereof was a guarantee document signed by Fuqua. *Id.*

As had been done in the lease, the names of Heavenly Ventures' other owners were stricken from the guarantee. *Id.* However, the parties failed to correct the guarantee's reference to Heavenly Ventures as the lessee. *Id.*

Citing this scrivener's error, Fuqua argued that the guarantee was unenforceable because it failed to adequately identify the principal debtor. *Id.* The Georgia Court of Appeals rejected Fuqua's argument. *Id.* Applying the contemporaneous-writings rule, the appellate court had

> little trouble concluding that the misnomer on the face of the Guaranty naming Heavenly Ventures as the principal debtor does not render that agreement unenforceable. Construed in tandem with the Lease, it is obvious that the parties intended that [C.L.D.F.] replace Heavenly Ventures as the tenant and principal debtor. It was thus not error for the trial court to correct an obvious error and interpret the Guaranty accordingly.

*Id.* at 696-97.

Importantly, the Georgia Court of Appeals in *C.L.D.F.* specifically addressed why its holding did not conflict with *Sysco* and its progeny, explaining:

> Those cases involve circumstances in which the guaranty agreement omits entirely the name of any specific debtor. . . . In an unbroken line of authority, this Court has consistently held that where a guaranty omits the name of the principal debtor, it is unenforceable as a matter of law. . . . In the pre-

> sent case, however, the Guaranty did not omit entirely the name of a debtor, but instead identified the wrong debtor in an obvious error easily corrected when the Lease and Guaranty are construed together. Accordingly, the cases cited by Fuqua are not applicable under the circumstances here.

*Id.* at 697 (internal quotation marks and citation omitted).

Unlike *C.L.D.F.*, the form-of guarantee document at issue in this case omits entirely (1) the name of the principal debtor (the "NEW TENANT" that has supposedly accepted assignment of an unidentified lease covering an unidentified property for an unidentified period of time); (2) the debt owed (liability under the unidentified lease); and (3) the promisee (the "LANDLORD" responsible for the unidentified lease). Therefore, the district court erred in failing to follow the rule of *Sysco*.

Moreover, the district court never addressed the fact that, even taking the similarity between the Lease Amendment's use of the terms "Lessor" and "Lessee," on the one hand, and the form-of guarantee document's use of the terms "Landlord" and "Original Tenant," the Lease Amendment contains no specifically defined term that correlates to the guarantee document's principal debtor ("NEW TENANT"). *See* MSJ Op. at 9-10, 1 JA 79-80. Instead, the Lease Amendment merely references the possibility that Living Centers could assign the Lease to

- 32 -

a broad category of possible entities. *See* Lease Am. ¶ 9, 1 JA 180 (permitting assignment to "Family Senior Care Holdings LLC or any of its subsidiaries or affiliates"). Therefore, even if *Sysco* had never been decided, the district court's decision would still conflict with Georgia precedent. *See, e.g.*, *Legacy*, 729 S.E.2d at 614 (explaining it is "well settled that a guaranty must identify the principal debtor *by name*").

Accordingly, this Court should reverse that portion of the district court's judgment finding the form-of guarantee document valid and enforceable against Mariner.

[*Remainder of Page Intentionally Blank*]

## CONCLUSION

For the foregoing reasons, the Court should reverse those portions of the district court's judgment (1) awarding Elderberry amounts for damages accruing after Elderberry terminated the Lease and (2) finding the form-of guarantee document enforceable against Mariner.

Dated: February 27, 2014          Respectfully submitted,


By:        s/James F. Segroves
          James F. Segroves
          HOOPER, LUNDY & BOOKMAN, PC
          975 F Street, NW, Suite 1050
          Washington, DC 20004
          (202) 580-7710
          (202) 580-7719 (fax)
          jsegroves@health-law.com

          Lori D. Thompson
          LECLAIRRYAN, PC
          1800 Wells Fargo Tower
          Drawer 1200
          Roanoke, VA 24006
          (540) 510-3011
          (540) 510-3050 (fax)
          lori.thompson@leclairryan.com

          *Counsel for Defendants-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Defendants believe this appeal may be resolved by reference to existing precedent and the district court record, making oral argument unnecessary. However, if the Court believes oral argument will aid the decisional process, Defendants will gladly present oral argument.

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 13-2176        **Caption:** Elderberry of Weber City, LLC v. Living Ctrs. – S.E., Inc.

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   ☑  this brief contains _____ 6,433 _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐  this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑  this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word 2010 _____ [*identify word processing program*] in
   14-point Century Schoolbook _____ [*identify font size and type style*]; **or**

   ☐  this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) James F. Segroves _____

Attorney for Appellants _____

Dated: February 27, 2014 _____

## CERTIFICATE OF SERVICE

The undersigned certifies that on this twenty-seventh day of February, 2014, he caused the foregoing Brief of Appellants to be filed using the Court's Electronic Case File system, which will automatically generate and send by e-mail a Notice of Docket Activity to counsel for all parties. The undersigned also certifies that, as required by Local Rule 31(d), he caused eight (8) true and correct copies of the foregoing brief to be transmitted to the Clerk of Court by third-party commercial carrier for next-day delivery.

s/James F. Segroves
James F. Segroves

**ADDENDUM**



Ga. Code Ann., § 13-5-30                                                                Page 1

**Effective:[See Text Amendments]**

West's Code of Georgia Annotated Currentness
   Title 13. Contracts
      Chapter 5. Defenses
         Article 2. Statute of Frauds (Refs & Annos)
       ➡➡ **§ 13-5-30. Obligations which must be in writing**

To make the following obligations binding on the promisor, the promise must be in writing and signed by the party to be charged therewith or some person lawfully authorized by him:

   (1) A promise by an executor, administrator, guardian, or trustee to answer damages out of his own estate;

   (2) A promise to answer for the debt, default, or miscarriage of another;

   (3) Any agreement made upon consideration of marriage, except marriage articles as provided in Article 3 of Chapter 3 of Title 19;

   (4) Any contract for sale of lands, or any interest in, or concerning lands;

   (5) Any agreement that is not to be performed within one year from the making thereof;

   (6) Any promise to revive a debt barred by a statute of limitation; and

   (7) Any commitment to lend money.

CREDIT(S)

29 Car. II, c. 3, Cobb's 1851 Digest, p. 1127; Laws 1851-52, p. 243, § 1; Laws 1855-56, p. 233, § 25; Laws 1855-56, p. 238, § 1; Laws 1880-81, p. 62, § 1; Laws 1962, p. 156, § 1; Laws 1988, p. 403, § 1.

**Formerly** Code 1863, § 1952; Code 1868, § 1940; Code 1873, § 1950; Code 1882, § 1950; Civil Code 1895, § 2693; Civil Code 1910, § 3222; Code 1933, § 20-401.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



C

**Effective: January 1, 2013**

West's Code of Georgia Annotated Currentness
  Title 24. Evidence (Refs & Annos)
    Chapter 3. Parol Evidence Rule (Refs & Annos)
      ➡➡ **§ 24-3-3. Explanation of ambiguities**

(a) All contemporaneous writings shall be admissible to explain each other.

(b) Parol evidence shall be admissible to explain all ambiguities, both latent and patent.

CREDIT(S)

Laws 2011, Act 52, § 2, eff. Jan. 1, 2013.

Current through the end of the 2013 Regular Session.

(C) 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.)))**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See CTA4 Rule 32.1.

United States Court of Appeals, Fourth Circuit.
MARGIE INTERNATIONAL TRADING COM-
PANY; Robert B. Green, Plaintiffs-Appellants,
and
Great South Services, Incorporated, Plaintiff,
v.
Robert M. STEIN; Edward S. Stein; Arthur H. Stein;
Barbara S. Fischer; Robert M. Stein, as Fiduciary
under the Will of Jack Stein, Defendants-Appellees,
and
Pinkerton's Incorporated, Defendant.
MARGIE INTERNATIONAL TRADING COM-
PANY; Robert B. Green, Plaintiffs-Appellees,
and
Great South Services, Incorporated, Plaintiff,
v.
Robert M. STEIN; Edward S. Stein; Arthur H. Stein;
Barbara S. Fischer; Robert M. Stein, as Fiduciary
under the Will of Jack Stein, Defendants-Appellants,
and
Pinkerton's Incorporated, Defendant.

Nos. 90-2180, 90-2181.
Argued June 3, 1991.
Decided Nov. 20, 1991.

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. J. Calvitt Clarke, Jr., Senior District Judge. (CA-89-558-N)
ARGUED: Richard Ivan Gulick, Norfolk, Va., for appellant.

James A. Gorry, III, Taylor & Walker, P.C., Norfolk,

Va., for appellees.

E.D.Va.

AFFIRMED.

Before ERVIN, Chief Judge, and SPROUSE and WILKINS, Circuit Judges.

OPINION
PER CURIAM:

**\*1** Robert Green leased space in a warehouse owned by the Stein family. After he was evicted, Green brought this action against the Steins alleging (1) breach of lease, (2) interference with third-party contracts, and (3) injury to business reputation. The Steins counterclaimed for damages resulting from Green's default and contended that he had been locked out as a result of his own breach of the lease. After a jury trial, the Steins were awarded $39,578.18 in lost rent and attorneys' fees. Green was awarded $10,000 for repairs he had made while in possession of the warehouse. Both parties appeal. Finding no error, we affirm.

I. Background

Robert Green, a New Jersey businessman, is the sole officer, director, and stockholder of Margie International Trading Company, the parent of Great South Services, Inc. In 1988, Great South was engaged in the cocoa bean business, operating out of leased warehouse space on Roberts Road in Norfolk, Virginia. Robert M. Stein, Edward S. Stein, Arthur H. Stein, Barbara S. Fischer, and the estate of Jack Stein (hereinafter, the "Steins") own a warehouse located at 2211-35 Barraud Avenue in Norfolk. Because his lease was soon to expire, Green approached the Steins in mid-1988, informing them that he was interested in purchasing the Barraud Avenue warehouse.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.)))**

Although the Steins were interested, they told Green that they needed time to locate other property, because they wanted to structure a sale to gain income tax advantages.

On August 3, 1988, the parties entered into two agreements, jointly prepared by their counsel. In one, a lease agreement, they agreed that Green would lease space in the Barraud Avenue warehouse. In the other, they agreed to the sale and purchase of the property with a closing date to be set on or before January 15, 1990. By its terms, the lease would terminate when the property was sold to Green in accordance with the purchase and sale agreement.

Several months into the lease, the Steins became distressed with Green's performance under the lease. The rent payment for May was past due. Green's check for the gas bill at the warehouse had bounced, and two mechanics' liens had been filed, encumbering the property. On May 3, 1989, the Steins' attorney informed Green by letter that the Steins considered Green to be in default. After Green failed to adequately respond to the May 3 letter, the Steins informed him on May 19, 1989, that the lease was terminated and advised him to vacate the premises.

Notwithstanding the notice to vacate, the parties attempted to resolve their difficulties. During the subsequent negotiations, Green continued to operate out of the warehouse, complying with the Steins' requirement for the payment of May and June rent plus a late payment fee. The payments were wired to the Steins' attorney on June 6, 1989.

After a series of meetings, negotiations between the parties broke down. On June 13, 1989, the Steins changed the locks and posted guards at the warehouse Green's employees were allowed limited access to the property until June 16, 1989. More negotiations ensued, but a new lease did not result. Ultimately, the Steins allowed Green to remain on the premises until July 31, 1989, giving him time to relocate his business. Green vacated the warehouse sometime in mid-July.

**\*2** The Steins set a closing date on the purchase and sale agreement. However, on September 6, 1989, after Green failed to appear for the closing, the Steins declared him to be in default on the purchase and sale agreement. They ultimately relet the premises.

II. The Proceedings Below

On July 28, 1989, Green and his company, Great South Services, Inc.,[FN1] filed a complaint against the Steins and Pinkerton's, Inc.,[FN2] containing three counts. Count I sought damages for breach of a lease agreement, Count II sought damages for interference with third-party contracts, and Count III sought damages for injury to business reputation. The Steins filed a counterclaim demanding damages resulting from breach of the lease agreement by Green.

At the conclusion of the evidence, the district court dismissed all three counts of Green's complaint. It submitted to the jury issues of whether Green was entitled to recover for the repairs and improvements to the warehouse (on a theory of unjust enrichment or quasi-contract)[FN3] and whether the Steins were entitled to recover on their counterclaim. The jury rendered a verdict for the Steins in the amount of $39,578.18 for lost rent and attorneys' fees. It awarded Green $10,000 for repairs and $40,000 for the improvements he had added.

The district court denied Green's motion for j.n.o.v. with respect to the award of lost rent and attorneys' fees. It granted the Steins' motion for j.n.o.v. with respect to the $40,000 award for improvements but denied their motion with respect to the $10,000 award for repairs. This appeal followed.

III

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.)))**

The parties challenge most of the dispositive rulings of the district court. Green attacks the district court's dismissal of Count I of his complaint (the breach of lease claim) and its denial of his motion for j.n.o.v. with respect to the awards of future rent and attorneys' fees, as well as the grant of the Steins' motion for j.n.o.v. as to improvements. The Steins, in turn, challenge the district court's denial of their motion for j.n.o.v. with respect to repairs. We review each of these issues in turn.

A. Dismissal of Count I of Green's Complaint

Green's theory on appeal is that, although the lease was terminated, the Steins' acceptance of rent for the months of May and June created a month-to-month tenancy or, alternatively, a tenancy at will, and that the Steins were therefore required to give notice before they could retake the premises.[FN4] We disagree with both contentions because there is simply no evidence in the record to support either conclusion. As the opinion of the district court indicates, the numerous letters between the Steins and Green make clear that neither party understood that the Steins' acceptance of the rent payment would create a tenancy at will or a month-to-month tenancy. As evidenced by letters between counsel on May 24 and May 31, 1989, both parties understood that acceptance of the payment by the Steins would not prejudice the Steins' rights under the terminated lease.

B. The District Court's Denial of Green's Motion for J.N.O.V.

1. *Future Rents*

**\*3** Green cites *tenBraak v. Waffle Shops, Inc.,* 542 F.2d 919 (4th Cir.1976), for the proposition that a landlord who elects to re-enter the premises upon breach of a lease terminates the lease and limits his recovery to the amount of rent accrued. While this is an accurate statement of the general rule in Virginia, the parties in this case elected to contract on different terms, as was their right. "It is well recognized, both at common law and under the law of Virginia, that parties to a contract of lease may modify their legal rights by provisions in the lease." *tenBraak,* 542 F.2d at 925 n. 8. In this case, Green and the Steins agreed in the lease agreement that "[n]o such termination of this Lease nor recovering possession of the demised premises, however, shall deprive Landlord of any action or remedy against Tenant for possession, rent (accrued or to accrue) or damages...." Therefore, the district court properly refused Green's motion for j.n.o.v. concerning future rent.[FN5]

2. *Attorneys' Fees*

Green argues that because there were no past due rents at the time of the lockout, no attorneys' fees were incurred by the Steins for the collection of delinquent rents. The pertinent provision in the lease agreement stated that "[t]enant further agrees to pay ... any and all attorneys' fees and court costs incurred in connection with the collection of delinquent rents and all other sums due the Landlord under this lease." We must reject Green's argument because the contract provides for attorneys' fees incurred in collection of "all other sums due the landlord under this lease" and because the argument fails to consider that substantial attorneys' fees were incurred by the Steins before the lockout while the May rent was unpaid.

C. The District Court's Grant of the Steins' Motion for J.N.O.V. With Respect to Improvements

Paragraph 24 of the lease states that all improvements become the property of the landlord upon termination of the lease. In light of this provision and the principle that the law will not imply a quasicontract where there is an express contract absent fraud or undue influence, the district court held that it had erred in submitting the issue to the jury, and granted the defendants' motion for j.n.o.v. as to the award of improvements. On appeal, Green argues that he should be entitled to the value of the improvements because both parties expected that he would ultimately own the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.)))**

property. Again, we disagree. While both parties intended for Green to purchase the warehouse, the terms of their agreements show that they were aware of the risk that the lease would be terminated and that the sale might not be consummated. Should those events occur, the risk of loss of the value of improvements was to fall upon Green. The parties, of course, were represented by counsel, the negotiations were at arm's length, and there is no evidence of fraud or undue influence.

    D. The District Court's Denial of the Steins' Motion for J.N.O.V. with Respect to Repairs

    **\*4** In denying j.n.o.v. with respect to repairs, the district court held that the award of the value of repairs was appropriate because the Steins had an express contractual obligation to make them. On appeal, the Steins admit that they were responsible for repairs under the terms of the purchase agreement, but claim that this duty did not arise until the closing of the sale of the warehouse. The relevant provision in the purchase agreement provides otherwise:

    Notwithstanding the foregoing, Seller agrees to perform or cause Legum Furniture Corporation to perform the obligations of Legum Furniture Corporation to make certain repairs to the warehouse in accordance with the Legum Lease and the letter from Robert M. Stein to Harry Weisberg, dated October 16, 1987 (included in Exhibit F) or to cause such repairs to be made.

    Nothing in this language makes this promise of the Steins conditioned upon closing the sale. In our view, therefore, the district court correctly denied the motion for j.n.o.v. on the award for repairs.

    For the reasons stated above, the decision of the district court is affirmed.

    AFFIRMED.

FN1. Margie International Trading Company has subsequently been substituted for Great South Services, Inc., in these proceedings. Green and Margie submitted the same brief and were represented at oral argument by the same counsel. They will be collectively referred to as "Green."

FN2. Pinkerton's was hired by the Steins to provide guards at the warehouse. Pinkerton's and Green have settled their dispute; consequently, Pinkerton's is no longer a party to these proceedings.

FN3. Without objection, evidence had been presented relating to these theories even though they had not been raised in the complaint.

FN4. Green cites in support a decision of the Virginia Supreme Court of Appeals, *Warehouse Distributors, Inc. v. Prudential Storage and Van Corp.,* 208 Va. 784, 161 S.E.2d 86 (1968). In *Warehouse Distributors,* the Virginia Supreme Court of Appeals stated that the acceptance of rent after the expiration of a lease created a tenancy at will. However, in determining the relationship between the parties in *Warehouse Distributors,* the court looked to correspondence between the parties to determine their intentions. A review of the correspondence between the parties in the case *sub judice* indicates that the payment by Green was merely a precondition to negotiations for a new agreement and that the parties did not intend that the payment would create a new tenancy.

FN5. Green argues that *Galvin v. Southern Hotel Corp.,* 154 F.2d 970 (4th Cir.1946),

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.))

**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.)))**

precludes us from interpreting the lease to permit recovery for future rent. In *Galvin,* we declined to enforce a forfeiture provision in a lease, holding that enforcement on the facts of that case would be unconscionable. We see nothing unconscionable here in allowing the Steins to recover for a few months of future rent.

C.A.4(Va.),1991.
Margie Intern. Trading Co. v. Stein
948 F.2d 1281, 1991 WL 240470 (C.A.4 (Va.))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.